IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF AVEON J.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF AVEON J., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

LACEIARA J., APPELLANT.

Filed June 13, 2023.    No. A-22-863.

Appeal from the Separate Juvenile Court of Douglas County: MATTHEW R. KAHLER, Judge. Affirmed.

Sarah E. Cavanagh, of Houghton, Bradford & Whitted, P.C., L.L.O., for appellant.

Shinelle Pattavina, Deputy Douglas County Attorney, for appellee.

RIEDMANN, BISHOP, and WELCH, Judges.

BISHOP, Judge.

INTRODUCTION

Laceiara J. appeals the preadjudication order of the separate juvenile court of Douglas County continuing temporary custody of her child with the Nebraska Department of Health and Human Services (DHHS) and excluding placement in her home. We affirm.

BACKGROUND

Laceiara is the mother of Aveon J., born in October 2022. Aveon's father is not identified in our record. Laceiara is also the mother of Aziah J. and Anova J., who are currently state wards in this open juvenile case.

- 1 -

On October 21, 2022, the State filed a third supplemental petition alleging that Aveon was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) because he lacked proper parental care by reason of the fault or habits of Laceiara in that:

A. Laceiara . . . currently has an open juvenile court case under [this same juvenile court docket number] involving her other minor children.

B. Under [this same juvenile court docket number], Laceiara . . . has failed to comply with court orders resulting in her minor children remaining in out of home care since August 2020 and November 2021.

C. Laceiara . . . has failed to adequately address her history of domestic [sic] in therapy, placing [Aveon] at risk of harm.

D. Laceiara . . . has not been forthcoming with information regarding her pregnancy of [Aveon] and actively attempted to prevent DHHS staff from knowing information as to said juvenile.

E. For the above reasons, [Aveon] is at risk for harm.

That same day, the juvenile court entered an ex parte order for immediate temporary custody and pick-up, placing Aveon in the temporary custody of DHHS, with placement to exclude Laceiara's home.

A first appearance and protective custody hearing on the third supplemental petition was held on October 31, 2022. Laceiara entered a plea of denial to the allegations in the third supplemental petition. The State then requested continued protective custody of Aveon, to exclude Laceiara's home; Laceiara resisted the request. The matter proceeded and the State called Betsy Miller to testify.

Miller, a child and family services supervisor with DHHS, testified that DHHS had been working with Laceiara and her children for "close to two years." Aziah was removed from Laceiara because of domestic violence with T.J., Aziah's legal father. On cross-examination, Miller confirmed that Aziah was injured in the course of the domestic violence perpetrated by T.J.; but Miller was also aware that T.J. was charged with child abuse by neglect, no injury. According to Miller, Anova was removed from Laceiara because of concerns of continued domestic violence from the same man.

Miller's team was assigned to the family's case in September 2022. At the transfer staffing with the previous case manager, Miller and Samantha Hutchinson (the new case manager Miller supervises), were given information on the family's case history, court orders, Laceiara's progress, and general updates on Aziah and Anova. According to Miller, Laceiara had been court-ordered to participate in agency-supervised parenting time, family support, drug testing, and individual therapy, and she was to have safe and stable housing and a legal source of income. Miller stated that Laceiara's progress has been "mix[ed]"; "[t]here's a lot of things that [she] does really well and then other things that are not yet completed and have needed to be re-referred due to unsuccessful discharges, as recent as September or early October."

Miller testified that Laceiara was recently unsuccessfully discharged from family support and parenting time through Lutheran Family Services because of her "multiple instances of verbal aggression" and because she was uncooperative and unwilling to follow the agency's rules. On cross-examination, it was established that prior to the most recent visitation worker ("JT"),

Laceiara had the same family support and visitation worker (Elodie Koffi) for the entirety of the case. When asked if the family support services and the parenting time services provided by JT were in "drastic contrast" to those provided by Koffi, Miller replied, "Yes." Koffi had been amenable to changes in the schedule and locations of the visits and allowed Laceiara to FaceTime her family during her visits. One of JT's complaints was that Laceiara was using FaceTime during her visits. When asked if she could "understand the frustration of a drastic change to the parenting time and family support work provided to her by the new individual," Miller replied, "Yes," and she acknowledged that the changes "could be" the cause of discord between Laceiara and JT.

Miller learned at the transfer staffing that Laceiara had ended a relationship with her former therapist at Generation Hope, but the previous DHHS case manager did not know why the therapeutic relationship ended because she could not get Laceiara to sign a release allowing her to speak to the therapist. This concerned Miller because a case manager's ability to speak with a therapist about the progress a parent is making is necessary to make recommendations for the family. Miller stated that Laceiara now had a new therapist at Generation Hope, but she did not sign a release until October 21. According to Miller, the new therapist reported that she had been seeing Laceiara for 2 months, but no progress had been made regarding domestic violence because whenever the therapist attempted to work on the issue with Laceiara, there was always something else that came up that Laceiara chose to discuss instead. This concerned Miller because the juvenile case "is very much centered around previous domestic violence concerns" and Laceiara knew that demonstrating domestic violence was no longer a concern was what would help her reunify with her children.

In addition to information provided by the new therapist, Miller had concerns about Laceiara's progress in addressing domestic violence because of an instance that occurred early on in her pregnancy with Aveon. Miller stated that in May 2022, Laceiara's car was set on fire, and Laceiara believed that T.J. was the person responsible. Laceiara indicated to DHHS that she had recently moved and did not believe T.J. knew where she lived, but he was still able to find her. Additionally, Miller reviewed copies of the police reports and summaries of conversations that took place around the time of the incident, and said that when questioned by police, Laceiara did not tell them who she suspected was responsible for the fire. It concerned Miller that Laceiara would not participate in legal action against someone who put her and her children in a dangerous position. (On cross examination, Miller stated that she was aware that Laceiara told the previous case manager that she attempted to get the police report updated to name T.J. as the perpetrator; but Miller was not aware of whether Laceiara actually made those attempts.) According to Miller, the car fire in May was not the only time that Laceiara's car was set on fire during the pendency of the juvenile case, but Miller did not know the exact date or circumstances of the first fire. It was Miller's understanding that T.J. was believed to be at fault for the first fire too, but Laceiara did not tell the police that she suspected T.J.

Miller stated that at the transfer staffing, she learned that Laceiara was due to have Aveon in late November or early December 2022. And when Miller and Hutchinson had a conversation with Laceiara in September, Laceiara "mentioned having quite a bit of time left in her pregnancy," but no specific date was given. However, when Miller and Hutchinson went to Laceiara's home for a monthly visit on October 21, Miller was surprised to find Aveon there with Laceiara. During that visit, Laceiara indicated that her due date was October 28, but that Aveon had been born about

2 weeks earlier than his due date. Miller was "concerned that if the reports were true that [Laceiara] had indicated that her due date was much later than October 28, that she was intentionally trying to keep her actual due date a secret from the department." Additionally, the week prior to the October 21 visit, Miller and Hutchinson had a visit scheduled with Laceiara, but Laceiara texted that she needed to reschedule. Miller thought nothing of it at the time, but "in hindsight it was concerning that [Laceiara] was communicating with the department after [Aveon's] birth and left that detail out, that her son had been born." Miller did not discuss her concerns with Laceiara on October 21, but she did speak to the executive director of the parenting time company that same day.

> Miller stated,
> [The executive director] indicated that his company had supervised a couple of visits over the prior week for [Laceiara], where Aveon was not present, and that they still believed her to be pregnant during those visits, when, in fact, she was not. Aveon was in the hospital and [Laceiara] was doing the visits with the girls and [the executive director] indicated concern that she did not let them know that her son was born and that he was going to be included in upcoming visits.

Thus, Laceiara had "multiple different opportunities to let several different case professionals know what was going on in her life, and she left out all of the important information about the birth of her baby and dealing with his hospitalization." (On cross-examination, Miller stated that according to Laceiara, Aveon was hospitalized after his birth because his bilirubin levels were high.) Miller stated,

> [The executive director] indicated on October 21, [2022,] that the day before, on the 20th, when they arrived for what they thought was a scheduled visit with the girls, that the baby was there. And when he -- he reported that they asked her why she didn't let them know. She said that she had been trying to figure out how to take care of things before telling the people involved in her case.
> . . . .
> . . . All he stated was that [Laceiara] had said that she was working on figuring out if there was a way to sign over custody or rights to her brother to avoid State involvement with the baby and that she had given birth in Council Bluffs, Iowa, to give herself time to figure out those things before letting us know.

Miller found it concerning that Laceiara would go to another state to give birth, and Miller believed "that was a clear attempt to try to avoid the department getting a notification of Aveon's birth." On cross-examination, Miller was asked if she ever told Laceiara that she was required to report to her or the visitation provider that her child was born, and Miller replied, "No." Miller confirmed that at the October 21, 2022, visit, Laceiara was holding Aveon when Miller arrived, and she did not try to hide or conceal him.

Miller authored an affidavit for removal of Aveon on October 21, 2022. In the affidavit, Miller recounted the removals of Aziah in 2020 and Anova in 2021; Laceiara's "long history of domestic violence involving [T.J.]"; the May 2022 car fire; that Laceiara attempted to file an updated protection order on T.J., but it was not currently active because he was not able to be

served; DHHS received an email on September 28 from an acquaintance of T.J. and Laceiara that claimed "He is currently living with her [(Laceiara)] now," and "He's been living with her since February of this year"; information by the previous case manager that Laceiara reported a sexual assault by T.J. in February, but it was unclear whether or not this information was previously provided to the court or whether other parties were aware of this; Laceiara's failure to provide accurate and/or timely information about her due date and Aveon's birth; Laceiara's progress or lack thereof in dealing with domestic violence programming in therapy; Laceiara's recent unsuccessful discharge from family support and parenting time services; and Miller's belief that Aveon "could be at risk for harm" if he remained placed with Laceiara.

Miller testified that "this is a family that has very, very severe domestic violence and things that have happened continuously over the course of this case that have put [Laceiara's] life in danger," but she was not really working on domestic violence issues. Miller stated, "[I]n learning that [Laceiara's] current therapist does not believe that she is able to be a protective parent and really work through those things," it "concerns me that if something were to happen again, that protective measures wouldn't be taken or that [Laceiara] wouldn't potentially choose to take the right protective steps to keep her children safe." "Aveon is at the most vulnerable age," "[a]nd if there were to be violence in his home or to his mother, if he were in her care, he would be very unsafe and unable to protect himself." Miller opined that it was in Aveon's best interests to be placed outside of Laceiara's home at this time.

On cross-examination, Miller acknowledged that Laceiara participated in drug testing, and Miller was not aware of any positive drug tests during Laceiara's pregnancy with Aveon. Miller also acknowledged that Laceiara had housing and a sufficient income for herself and her children. Miller stated that after the May 2022 fire, Laceiara chose to stop having visits in her home because "she then knew that [T.J.] knew where she was residing"; Miller acknowledged that Laceiara's response was "protective," something that was different from prior incidents with Aziah and Anova. Once Laceiara obtained new housing, visits resumed in her home. Miller stated that she had been to Laceiara's home twice and did not see any evidence of a male living in the apartment; the first time Miller visited Laceiara at her home, "all of the belongings were in boxes," "[s]he hadn't unpacked." When asked if she had any evidence that Laceiara had any contact with T.J. since May 4, 2022, Miller replied, "No." Miller confirmed that there were current court orders that Laceiara was not to have contact with T.J.

On redirect, Miller testified that the previous case manager "specifically reported to us" that Laceiara had "a long history of secrecy and evading questions and manipulation, not always outwardly lying about things but only telling half versions of events until someone would find out more information." Miller knew that Laceiara had been secretive in the past with respect to her contact with T.J. Miller testified,

> I know that specifically [Laceiara] had phone calls with [T.J.] when he was incarcerated and she talked with me specifically about that in October [2022] and said that she had not told people that she was communicating with him and that she felt bad for him and that she knew that no one would understand that she was just trying to make him feel better while he was in jail because she knew what it was like to have no one to talk to.

Miller stated, "[W]ith the extreme level of the domestic violence, [Laceiara] still presenting with an attitude of sympathy for [T.J.] is concerning . . . that she may not be able to be protective against him in the future."

In its order entered on November 3, 2022, the juvenile court found Miller's testimony to be credible; that there was evidence demonstrating a pattern of over 2 years of contact with T.J. placing Laceiara and her children at further risk of harm; and a continuing pattern of dishonesty with case professionals. The court also took into consideration the fact that Laceiara had not moved beyond supervised visitation due to ongoing safety concerns, and that she had recently been unsuccessfully discharged from a visitation provider due to her conduct. The court further found that reasonable efforts, including ongoing case management, were made to prevent the removal of Aveon from the parental home, but that due to exigent circumstances, it was contrary to Aveon's health and safety to be returned home at this time, and that it was in his best interests to remain in the temporary custody of DHHS, to exclude Laceiara's home, until further order of the court; the court ordered the same. An adjudication hearing on the third supplemental petition was set for December 21.

Laceiara appeals.

ASSIGNMENT OF ERROR

Laceiara assigns that the juvenile court erred in finding that continued detention of Aveon in out-of-home placement pending adjudication was necessary.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

ANALYSIS

A detention order entered after a hearing which continued to keep a juvenile's custody from his or her parent pending an adjudication hearing to determine whether the juvenile is neglected, pursuant to § 43-247(3)(a), is final and thus appealable. *In re Interest of Michael N.*, 302 Neb. 652, 925 N.W.2d 51 (2019).

Continued detention pending adjudication is not permitted under the Nebraska Juvenile Code unless the State can establish by a preponderance of the evidence at an adversarial hearing that such detention is necessary for the welfare of the juvenile. *In re Interest of Anthony G.*, 255 Neb. 442, 586 N.W.2d 427 (1998). Here, the juvenile court found by a preponderance of the evidence that continuation in Laceiara's home would be contrary to Aveon's welfare. We agree. We will not recount the evidence set forth previously in this opinion. Notably, domestic violence was the reason for the removal of Laceiara's two older children, both of whom remain out of her home. Despite domestic violence being a barrier to reunifying with her children, there is no evidence that Laceiara has even addressed the issue with her therapist. Laceiara suspected that T.J. set her car on fire twice, once while she was pregnant with Aveon. Yet Laceiara still showed

sympathy and concern for T.J. after Aveon's birth, telling Miller that she had communicated with T.J. while he was in jail. Aziah was injured during the course of the domestic violence between Laceiara and T.J. We find that Laceiara's continued connection with T.J. places Aveon at risk for harm. Based on the record before us, a preponderance of the evidence shows that continued detention is necessary for Aveon's welfare.

CONCLUSION

For the reasons stated above, we affirm the juvenile court's order continuing temporary custody of Aveon with DHHS and excluding placement with Laceiara.

AFFIRMED.